**INSTITUT PASTEUR and Centre National de la Recherche Scientifique, Plaintiffs,**

v.

**Adam J. SIMON, Ph.D., Defendant.**

**Civil Action No. 98–727.**

United States District Court, E.D. Pennsylvania.

Aug. 19, 2005.

Albert J. Breneisen, Christopher L. Ogden, Elizabeth Gardner, Patrice P. Jean, Richard S. Gresalfi, William G. James, Kenyon & Kenyon, Daniel F. Schiff, James B. Swire, Dorsey & Whitley, Llp, Richard F. Albert, Lankler, Siffert & Wohl, New York, NY, David W. Marston, Jr., Thomas B. Kenworthy, John V. Gorman, Morgan, Lewis and Bockius Llp, Philadelphia, PA, Jerold I. Schneider, Dorsey & Whitney Llp, Washington, DC, Lynn Collins, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Mari Shaw, Obermayer Rebmann Maxwell & Hippel Llp, Paul Kennedy, Pepper Hamilton Llp, Morgan Lewis and Bockius L.L.P., Philadelphia, PA, for PlaintiffS.

Clifford E. Haines, Haines & Associates, Daniel M. Cohen, H. Laddie Montague, Jr., Peter R. Kahana, Berger & Montague, P.C., Philadelphia, PA, Cutis B. Miner, David Boies, Stephen R. Neuwirth, Boies & Schiller, Llp, Armonk, NY, for Defendant.

## OPINION

POLLAK, J.

This litigation grows out of a dispute between, on the one hand, an American physicist, Dr. Adam J. Simon ("Simon"), and, on the other hand, a French research institution, Institut Pasteur ("Pasteur"), and a French governmental agency, Centre National de la Recherche Scientifique ("CNRS"), that supports the research efforts of institutions such as Pasteur and that also conducts research in its own laboratories.

The broad outlines of the dispute are described in this court's November 13, 2003 opinion, and need not be repeated here. (Because the November 13, 2003 opinion was not reported in F.Supp.2d, a copy is annexed to this opinion as Appendix A, to facilitate easy reference). For present purposes, the following will suffice: At the invitation of Dr. David Bensimon, a senior CNRS physicist, Simon—a 1992 University of Chicago Ph.D.—spent from September 1993 to August 1995 in Paris, participating, in collaboration with several French scientists, in on-going research on molecular combing. For the most part Simon worked at CNRS, but occasionally at Pasteur, which was cooperating with CNRS on molecular combing research. In 1994 CNRS and Pasteur began seeking patent protection, first in France and then in the United States, for the fruits of the research. The patent applications listed certain CNRS and Pasteur scientists as inventors, but did not include Simon. United States patents issued in 1997 and 1998. Contending that he was the principal inventor, Simon filed counter-patent applications.

In 1998 CNRS and Pasteur initiated this proceeding, seeking a declaration that Simon has no cognizable interest, either as inventor or as owner, in the patented molecular combing processes. As to ownership, plaintiffs CNRS and Pasteur contended that as a matter of French law the fruits of Simon's labors, while working on assigned projects in laboratories of CNRS and Pasteur, belonged to CNRS and Pasteur. Plaintiffs also alleged that on February 7, 1995 Simon had signed an agreement captioned *Conditions D'Accueil dans le Laboratoire [Terms of Admission to Laboratory]*: Article 3 of the *Conditions* stated that "les resultats de l'Etude, bre-

vetables ou non ... sont la propriete pleine et entiere du CNRS" ["the results of the study, whether patentable or not ... are the full and complete property of the CNRS"]; and Article 6—a handwritten addition—stated (in translation) "that inventors/authors of commercialized results will receive 25% of what is collected by the CNRS for the length of the commercial operation." In response, Simon filed several counterclaims: in the counterclaims Simon alleged that the purported agreement of February 7, 1995 was the product of duress, and also of fraud in the inducement, and therefore was void; further, Simon sought a declaration of his status both as owner and as inventor; and Simon sought damages.

The ownership issue became the focus of a motion for partial summary judgment filed by plaintiffs. Armed with the expert testimony of a French lawyer, plaintiffs contended that, pursuant to the French Intellectual Property Code (Code Civil Article L. 611–1 *et seq.*), the work done by Simon in plaintiffs' laboratories belonged to plaintiffs. Simon, countering with the testimony of another French lawyer, contended that the Intellectual Property Code lodged ownership of his work product in him.[1] A third French lawyer, serving as a court-appointed expert, was in substantial agreement with Simon's expert. This court was not persuaded by any of the three experts; all of the French case law adduced by the experts seemed to this court to address factual situations too remote from the case at bar to offer persuasive guidance. This court's construction of the Intellectual Property Code led the court to conclude that whether Simon's work product belonged to CNRS and Pasteur depended on whether he was, within the intendment of the Code, a "public agent" of CNRS, and that in turn depend-

ed on whether he was *in the employ* of CNRS. This last question was deemed by the court an issue of material fact as to which no firm conclusion could be arrived at, one way or the other, on the record before the court. Accordingly, this court denied plaintiffs' motion for partial summary judgment. *Institut Pasteur v. Simon,* C.A. No. 98–727 (E.D.Pa., Nov. 13, 2003) (Appendix A).

### I.

With fact discovery at an end, plaintiffs CNRS and Pasteur have filed three motions for partial summary judgment directed at defendant Simon's counterclaims. One motion challenges Simon's contentions as to damages. Another challenges his contentions with respect to inventorship. The third—the motion addressed in this opinion (Docket No. 176)—argues that, under governing French law, CNRS, not Simon, owns the product of the research Simon conducted at the laboratories of CNRS and Pasteur.

Plaintiffs' argument on the ownership question is two-fold:

*First,* plaintiffs contend that, although this court in 2003 ruled that, on the facts then of record, French case law and French statute law did not yield a firm answer on whether Simon owns the molecular combing research that he conducted, a 2004 decision of a French appellate court establishes, as a matter of law, that ownership of the product of the research belongs not to Simon but to CNRS.

*Second,* plaintiffs contend (independently of the first contention) that the full factual record now before the court shows that there is no factual basis for Simon's counterclaim I that the February 7, 1995 agreement acknowledging CNRS's owner-

---

**1.** For the purpose of addressing plaintiffs' motion for partial summary judgment, the parties assumed the non-existence of the putative February 7, 1995 agreement.

ship of the product of Simon's research was the product of duress, and of fraud in the inducement, and hence is void.

## II.

## A.

The appellate decision on which plaintiffs rely, in asking this court to revisit its November 13, 2003 ruling, was issued on September 10, 2004 by the Court of Appeal of Paris. The decision—case number 2002/12276—reviewed and reversed the April 2, 2002 decision of the Tribunal de Grande Instance de Paris in a case brought by CNRS against Dr. Michel Puech. (For the purposes of this opinion, case number 2002/12276 is referred to as "*CNRS v. Puech*")[2]

For several months in 1997 Dr. Puech, an opthalmologist, pursued research, as an unpaid intern, at CNRS's Laboratoire d'Imagerie Parametrique ("LIP"). Puech's initial research assignment, carried out under the supervision and with the advice of LIP scientists, focused on "in vivo transfer of methodologies for characterizing ocular tissues by high-frequency ultrasound." This research assignment was linked to the thesis Puech was contemporaneously preparing as a candidate for an additional advanced degree at the Universite de Technologie de Compiegne. In the course of his research, Puech, "by accident," hit upon a technique for ultrasound examination of the eye capable of scanning not merely the eye's anterior seg-

ment (a technique already known) but the eye's posterior segment. This accidental discovery led Puech to change the direction of the research he was conducting at LIP. After completing the internship at LIP, Puech in late1997 and in 1998 filed French patent applications based on the new technique for ultrasound examination of the posterior segment of the eye.

CNRS, in 2000, sued Puech, claiming that the patent applications belonged to CNRS by virtue of Article 3 of *Reglement de Travail Interne au Laboratoire D'Imagerie Parametrique* [*Personnel Regulations for the Laboratory of Parametric Imagery* ], a document signed by Puech on May 22, 1997. Article 3 provided (in translation) that: "In the event the activities undertaken result in the development of manufacturing processes or technologies that could be patented, the patents, knowledge, or digitized information shall remain the property of the CNRS." Joining CNRS in *CNRS v. Puech* were the LIP scientists who had been Puech's supervisors and collaborators; they contended that they were co-inventors. Puech contended that "he alone developed the invention, which was the subject of the aforementioned patents, and did so as a volunteer at the LIP–CNRS Laboratory"; that "he is neither an employee nor a civil servant of the CNRS . . ."; and that "the agreement cited by the CNRS is illegal, for it contradicts the public policy of article L 611–7 of the

---

**2.** Simon notes that plaintiffs' view of the applicable French law, predicated on the decision of the Court of Appeal in *CNRS v. Puech,* is put forward without any supporting apparatus of expert testimony as to French law. (This absence of expert testimony is in marked contrast to the elaborate—and conflicting—testimony on French law adduced by the French-law experts presented by plaintiffs and by defendant, and also by this court's French-law court-appointed expert, addressed to the motion of plaintiffs for partial summary

judgment that was denied by this court in its November 13, 2003 opinion). Expert testimony on foreign law is frequently helpful to an American federal court charged with finding foreign law, but there is no legal requirement that a court's ruling with respect to foreign law be bottomed on expert opinion. "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." F.R.Civ.Proc. 44.1.

Intellectual Property Code and, in any event, was never signed by him."

The Tribunal de Grande Instance de Paris, on April 2, 2002, ruled as follows:

(1) The LIP scientists had failed to establish that they were co-inventors.

(2) As to CNRS's claim of ownership of Puech's invention, the court stated:

The Intellectual Property Code instituted a regime of law in the name of the inventor, a regime that is also applicable to any public corporation;

With respect to the terms of article L 611–6 of the Intellectual Property Code, ownership of the patent belongs to the inventor or his assign;

That the only exception to this rule is instituted by article L 611–7 of the Intellectual Property Code, which provides for a specific regime for salaried inventors.

Given these conditions, the Court holds:

That the aforementioned article 3 cannot be interpreted as depriving the inventor, whether student, intern, interim employee, or term-contract employee of the LIP, of his intellectual property rights;

That it can be understood only as a contractual engagement on the part of the student, intern, interim employee, or term-contract employee to turn over to the CNRS ownership of the work performed on its behalf;

That in this particular instance, Mr. Puech did in no way act on its behalf once he reoriented his research following his discovery, this discovery in no way falling within the field of research that was initially assigned to him.

The Court feels strongly that this agreement cannot cover the discovery in question once Mr. Puech was able to use the Dassault probe beginning in March 1997 and that he obtained the human eyes at the start of May 1997, which establishes that he had developed his invention before signing the May 22, 1997 agreement.

On this basis, the Court rejects the request of the CNRS that is based on violation of the internal agreement.

The Court of Appeal of Paris issued its ruling on September 10, 2002. The appellate court agreed with the court of first instance that the LIP scientists had not shown that they were entitled to be regarded as Puech's co-inventors. But the appellate court held that the court of first instance erred in ruling that Puech, rather than CNRS, was the proper owner of the patent applications filed by Puech. The pertinent paragraphs of the opinion of the Court of Appeal of Paris are as follows:

Whereas the respondent claims that the L.I.P. internal regulations do not apply to him because they would contradict the terms applicable to the matter found in articles L. 122–34 and L. 122–35 of the Labor Code; and also notes that the agreements between the Université Pierre et Marie Curie and the CNRS do not legally allow the CNRS to claim ownership of a patent on behalf of said University;

But whereas Mr. Puech has contributed to the realization of the invention while he was a trainee at the L.I.P.;

Whereas the L.I.P. is a laboratory of the CNRS, a national public-law entity of a scientific and technological nature, responsible for providing a public service of an administrative nature;

Whereas Ms. Puech is a user of the administrative public service provided by the CNRS through its laboratory;

Whereas the user of a public service of an administrative nature, like Mr. Puech, is subject to the internal regulations issued by the head of the service, the competent authority for determining the terms of organization and operation of the service;

Whereas he must comply with these regulations and their modifications: he can only challenge those provisions that would appear wrongful in view of the mission conferred upon the head of the service;

Whereas service regulations are distinct from the internal regulations contemplated by articles L. 122–33 *et seq.* of the Labor Code, which governs only labor law relations and not the interactions between an administrative public service and its users;

Whereas article 3 of the *"Personnel Regulations for the Laboratory of Parametric Imaging,"* [*"Règlement de travail interne au laboratoire d'imagerie paramètrique"*] therefore, applies to Mr. Puech, who signed it;

Whereas, it states that:

*"In the event the activities undertaken result in the development of manufacturing processes or technologies that could be patented, the patents, knowledge, or digitized information shall remain the property of the CNRS,"*

Whereas, unlike the pecuniary rights that the decree provisions provide for public agents, it is legitimate that students who have participated in an invention do not participate in its monetary benefits;

Whereas Mr. Puech is a user of a public service; and benefits from instruction at the Universitè de Compiègne as well as at L.I.P. and the facilities at the laboratory and the work of all the technical personnel; and whereas Mr. Puech will, moreover, benefit from a university degree and the appearance of his name on the patent in which he participated;

Whereas, moreover, even though Mr. Puech did not sign the regulations [*"Personnel Regulations for the Laboratory of Parametric Imaging "*] until May 22, 1997, that is, after the realization of his invention, these are service regulations, which are binding on him as a user of the L.I.P.;

Whereas the first judges were wrong to have found that the regulations could not apply to the invention in question because Mr. Puech was able to use the Dassault probe beginning March 1977;

Whereas it results from these findings that French patent application 9716071 and PCT application 9802788 filed by Mr. Puech are the property of the CNRS; that the CNRS is, consequently, justified in bringing an action for ownership in its own name; that the CNRS shall be substituted for Mr. Puech as owner of French patent 9716071 and PCT patent 9802788 and all foreign patents that follow from this application; and that the judgment shall be set aside since it rejected the claim of ownership of the CNRS.

## B.

This court's opinion of November 13, 2003 noted that "the case law debated by the [French law] experts (and, in turn, by counsel in post-hearing memoranda enlarging upon the experts' submissions) has seemed to the court to be addressing, in almost every instance, fact patterns that were fairly remote from the case at bar," and that "none of the cases, either singly or in the aggregate, seemed to shed more than glancing light on how a French court would assess the relationship between Dr. Simon and CNRS/Institut Pasteur." P.19 n. 7. Among the cases "debated by the experts" was *CNRS v. Puech* as decided by the court of first instance in 2002. And, like the other "debated" cases, it presented a fact pattern that seemed to this court "fairly remote from the case at bar:" Puech, unlike Simon, was an uncompensated "volunteer." And the court of first instance found that Puech "did in no way act on [CNRS's] behalf," his "discov-

ery in no way falling within the field of research initially assigned to him." Simon, by contrast, was, throughout his tenure at the laboratories of CNRS and Pasteur, working on aspects of the CNRS molecular combing research project that Dr. David Bensimon had invited him to join. Accordingly, the decision of the court of first instance in *CNRS v. Puech* offered no real guidance to the resolution of CNRS's claims against Simon. The court of first instance did, of course, observe that "[w]ith respect to the terms of article L 611–6 of the Intellectual Property Code, ownership of the patent belongs to the inventor or his assign," and that "the only exception to this rule is instituted by article L 611–7 of the Intellectual Property Code, which provides for a specific regime for salaried inventors." However, the court of first instance did not use the occasion to explore the indicia of "salaried inventors"—indicia which, had they been explored by the court of first instance, might have been instructive to this court on the issue this court felt could not be resolved on the record as it then stood, namely, whether Simon was "in the employ" of CNRS and hence a "public agent."

In short, the April 2, 2002 decision of the Tribunal de Grande Instance de Paris in *CNRS v. Puech*, which "reject[ed] the [ownership] request of CNRS," was of no more than marginal pertinence to the issues addressed by this court in its November 13, 2003 [3] opinion. But the opinion of the Court of Appeal of Paris of September 10, 2004, holding "that French patent application 9716071 and PCT application 9802788 filed by Mr. Puech are the property of the CNRS," would appear to be of direct pertinence to resolution of the ownership question as that question is now framed before this court. In the appellate phase of *CNRS v. Puech*, what was dispos-

itive for the Court of Appeal of Paris was not the Intellectual Property Code, to which scant reference was made, but article 3 of the *Personnel Regulations for the Laboratory of Parametric Imaging*, which provided that, if research conducted at LIP resulted in [in translation] "technologies that could be patented, the patents ... shall remain the property of the CNRS." When the case at bar was addressed by this court in 2003, the parties and the court assumed *arguendo* that, apart from the Intellectual Property Code, there was no document of a contractual nature or otherwise purporting to define the relationship between Simon and CNRS. But as the case at bar is presented to this court today, it is necessary to take cognizance of the document entitled *Conditions d'Accueil Dans le Laboratoire [Terms of Admission to Laboratory]* which Simon signed (under duress, or due to fraud in the inducement, Simon contends) on February 7, 1995. Article 3 of the document states that "La Beneficiaire et l'organisme qui l'emploie reconnaissent que les resultats de l'Etude, brevetables ou non, y compris les logiciels sont la propriete pleine et entiere du CNRS, qui pourra deposer des brevets en son nom et a sa charge, pendant ou a la suite des travaux effectues dans le cadre de l'Etude, pour proteger les inventions eventuelles" ["The beneficiary and his/her employer organization hereby acknowledge that the results of the Study, whether patentable or otherwise, including software, are the full and complete property of the CNRS, which may file its patents in its name and at its own expense, during or subsequent to the period of activities performed as part of the Study, to protect any inventions that may emerge"].

Plaintiffs contend that article 3 of the *Terms of Admission to Laboratory* vest-

---

3. See note 1, *supra*.

ed in CNRS ownership of the fruits of Simon's research just as article 3 of the *Personnel Regulations for the Laboratory of Parametric Imaging* vested in CNRS ownership of the fruits of Puech's research. Simon contends that the document signed by Simon is unlike the document signed by Puech—that Simon's document (which Simon contends is, in any event, the product of duress and of fraud, and hence void) is in form "an agreement" between Simon and CNRS, whereas the Puech document bears the title "regulations" and hence has a generality of application to LIP laboratory personnel not shared by the document signed by Simon, who worked at a different laboratory.

The variations in syntax between the two documents constitute a distinction without a difference. Puech's document utilized the French word "reglement" ["regulations"], Simon's the French (and English) word "conditions," and was, according to its preamble, "[a] remplir at a faire signer par tout personnel exterieur au CNRS des son arrives au Laboratoire ..." ["[t]o be completed and signed by all non-CNRS personnel upon their arrival in the Laboratory ..."] Each document deals with governance of the conduct, in relation to CNRS, a public entity, of persons undertaking to carry out activities in a CNRS laboratory. The Court of Appeal of Paris characterized the Puech document as "service regulations," which deal with "the interactions between an administrative public service and its users," and "which are binding on [Puech] as a user of the L.I.P." It is the view of this court that, if the controversy at bar had arisen in the courts of France, the Court of Appeal of Paris would, in similar fashion, have characterized the Simon document as a "service regulation" which was "binding" on Simon. Moreover, it is apparent from the opinion of the Court of Appeal of Paris that it regarded the "regulations" as "bind-

ing" on Puech from the commencement of his internship. The fact that Puech, as the appellate court noted, "did not sign the regulations until after May 22, 1997, that is, after the realization of his invention"—a fact which, for the court of first instance, militated strongly in Puech's favor—did not help Puech in the appellate court, for, the appellate court said, "these are service regulations, which are binding on him as a user of the L.I.P." In cognate fashion, it follows that the timing and circumstances of Simon's signing his document are of no significance. If one assumes, for purposes of discussion, that Simon is correct in his contention that he signed under duress, or as the victim of fraud in the inducement, this would not undercut the ownership claim of CNRS, because the "conditions" contained in the Simon document were "binding on him as a user of" CNRS laboratories from the inception of his tenure at the laboratories in September 1993.

Accordingly, it is the conclusion of this court that CNRS, not Simon, is the owner of the product of the research conducted by Simon at the CNRS and Pasteur laboratories in 1993–1995.

### III.

Given the conclusion arrived at in Part II of this opinion—namely, that, pursuant to the legal principles announced by the Court of Appeal of Paris in *CNRS v. Puech*, CNRS is, as a matter of French law, the owner of the fruits of Simon's research—it is unnecessary to address the second, alternate, ground for plaintiffs' motion for partial summary judgment with respect to the ownership issue.

### CONCLUSION

For the foregoing reasons, an order accompanying this opinion will grant plaintiffs' motion for partial summary judgment and declare CNRS to be the owner of the

product of the research conducted by Simon in the plaintiffs' laboratories in 1993–1995.

## ORDER

For the reasons set forth in the accompanying opinion, it is hereby **ORDERED** that plaintiffs' motion for partial summary judgment with respect to ownership (Docket No. 176) is **GRANTED.** CNRS is hereby declared the owner of the product of the research conducted by the defendant in the plaintiffs' laboratories in 1993–1995. Summary judgment is entered in favor of plaintiffs and against defendant on count I of plaintiffs' complaint.

## APPENDIX A

**November 13, 2003**

### OPINION

The issue to be addressed in this opinion is one of French law. That issue is whether—as defendant, Dr. Adam J. Simon, contends, and plaintiffs, Centre National de la Recherche Scientifique (CNRS) and Institut Pasteur deny—Dr. Simon has, under French intellectual property law (the substantive law which, the parties and the court agree, governs this aspect of the pending litigation), a legally cognizable interest in certain United States patents involving processes of molecular combing with respect to which Dr. Simon claims to be a co-inventor.

Dr. Simon is an American physicist. Institut Pasteur is a noted French center of scientific research. CNRS is an agency of the French government that supports the research programs of other institutions and also engages in research projects of its own, sometimes in collaboration with other institutions such as Institut Pasteur. Pursuant to an invitation to participate in ongoing research on molecular combing, Dr. Simon came to Paris in the summer of 1993 and worked in laboratories of CNRS (and, occasionally, Institut Pasteur) from September of 1993 to August of 1995. The patents in question are fruits of the research in which Dr. Simon participated during those two years.

This law suit commenced as an action brought by CNRS and Institut Pasteur seeking a declaratory judgment that Dr. Simon has no valid interest in the patents. Dr. Simon resists plaintiffs' claims and has also filed certain counterclaims. (The counterclaims are, however, not pertinent to the matters canvassed in this opinion). Plaintiffs CNRS and Institut Pasteur have moved for partial summary judgment, contending that they are as a matter of French law entitled to judgment that Dr. Simon has no cognizable interest in the patents. The plaintiffs have supported their motion with expert testimony on the governing principles of French law. Dr. Simon, opposing the motion, has presented his own expert testimony on French law. The court and the parties have also had the benefit of a court-appointed expert on French law. The testimony of the experts has focused on a statement of facts agreed upon for the purposes of the plaintiffs' motion for partial summary judgment. After extensive hearings and briefings, plaintiffs' motion is ripe for disposition. **A Summary of the Principal Facts Upon which the Parties have agreed for the Purposes of the Pending Motion**

In January 1993, Dr. David Bensimon, the head of the Ecole Normale Superieure Laboratoire de Physique Statistique ("Statistical Physics Laboratory") (CNRS URA D 1306), invited Dr. Simon—a then recently-minted Ph.D. physicist (University of Chicago)—to take part in molecular combing research in Dr. Bensimon's laboratory, and Dr. Simon accepted that invitation. Dr. Simon applied to the French government for an "award of long-term scientific residency" with Dr. Bensimon as his "responsable du Stage" ("person responsible

for [Dr. Simon's] training"), and the French Ministry of Foreign Affairs awarded Dr. Simon a one-year renewable monetary grant. While CNRS assisted Dr. Simon in obtaining the French financing, CNRS did not itself provide any compensation to Dr. Simon nor did Dr. Simon sign an employment contract with CNRS. The Centre International des Etudiants et Stagiaires (International Center of Students and Interns) provided social welfare insurance and the Paris Police Headquarters issued Dr. Simon a temporary student resident card. The United States National Science Foundation (NSF) later awarded Dr. Simon a fellowship under its "International Post-doctoral Fellows Program," and the NSF/NATO awarded Dr. Simon an additional fellowship.

Dr. Simon served as a researcher in France from September 1, 1993 to August 15, 1995 at two CNRS laboratories. Simon first conducted research at the Statistical Physics Laboratory with Dr. David Bensimon, Dr. Vincent Croquette, and Dr. Arnaud Chiffaudel. Approximately one year later, Dr. Simon transferred to Dr. Francois Heslot's Laboratoire de Physique de la Matière Condensée (Condensed Matter Physics Laboratory) (CNRS URA D 1437) and continued conducting research there until August of 1995.[1]

The parties' dispute stems from conflicting views as to what persons and/or entities have, under French intellectual property law, what proprietary interests in certain molecular combing processes used to detect DNA molecules. For purposes of the partial summary judgment motion, it is assumed that Dr. Simon made a sig-nificant contribution to the invention of these processes.

CNRS and Institut Pasteur commenced filing patent applications on the molecular combing processes in 1994 (i.e., during Simon's first year of research at CNRS), and in 1995. Although Dr. Heslot, Dr. David Bensimon and Dr. Aaron Bensimon were listed in these applications as co-inventors, none of the applications listed Dr. Simon as a co-inventor. United States patents were issued to CNSR and Institut Pasteur in 1997 and 1998.

Following his departure from CNRS and return to the United States in August of 1995, Dr. Simon executed a patent application in the United States, and a corresponding Patent Cooperation Treaty application in France. One year later, he executed a European patent application covering the disputed inventions.

In February of 1995, Dr. Simon and Dr. Heslot, the director of the Laboratoire de Physique de la Matière Condensée, signed a document purporting to assign Dr. Simon's interests in his inventive work at CNRS and Institut Pasteur to CNRS in return for 25% royalties, with retroactive effect to September 1, 1993, the beginning of Dr. Simon's relationship with CNRS. The parties have stipulated, however, that, for purposes of the partial summary judgment motion, this document shall be held to have never been in effect.

**Procedural Background of the Partial Summary Judgment Motion**

Plaintiffs filed this action on February 13, 1998, alleging that defendant Simon "wrongfully contended both that he is an

1. Dr. Simon worked occasionally in the laboratories of plaintiff Institut Pasteur with Dr. Aaron Bensimon, but did not have a formal relationship with Institut Pasteur. Institut Pasteur is a party to this case because Institut Pasteur and CNRS have an agreement for the joint development of certain research projects and the sharing of resultant revenues. Institut Pasteur and CNRS collaborated on the research at issue here and Institut Pasteur is listed as a co-owner of the patents.

inventor and owner of the Inventions which are the subject of the patent applications" and seeking declaratory judgment as to both inventorship and ownership of the patents at issue. Dr. Simon responded that "CNRS and Institut Pasteur engaged in a fraudulent scheme and conspired together to deny Simon his rights and privileges as inventor and owner of patent rights associated with inventions he made in CNRS labs." Dr. Simon also filed a counterclaim, raising a number of issues that are not immediately relevant to the resolution of the pending motion.

The parties are in agreement that French law governs the question of whether Dr. Simon has an ownership interest in the molecular combing inventions and the patents that derive from those inventions. In their motion for partial summary judgment, plaintiffs, relying on the report and testimony of their French law expert, Jean C. Grosdidier de Matons, contend that they own the patents because Dr. Simon's work at the state-run CNRS laboratory qualified him as a "public agent" whose inventive works automatically belong to the state under French law. Conversely, Dr. Simon responds that plaintiffs cannot establish ownership as a matter of law because Dr. Simon does not fall into the categories of researchers, such as "public agents" and/or *salariés* (salaried persons), who do not own their own inventive works. Dr. Simon has submitted the report and supplementary testimony of his French law expert, Gerard Portal, in support of his argument. On June 1, 2001, this court appointed George Bonet as a neutral French law expert. Professor Bonet submitted a report concluding, as had the report of M. Portal, that Dr. Simon retained an ownership interest in the inventions. M. Grosdidier de Matons and M. Portal subsequently submitted additional reports. During the week of August 19, 2002, the court entertained oral arguments on plaintiffs' motion and heard testimony from both parties' expert witnesses. Post-hearing memoranda were filed in November and December of 2002.

## Discussion

The French Intellectual Property Code ("the Code") begins with the default assumption that the inventor generally owns his or her inventive works. *See* Code Civil Article L. 611–6 (*translated in* Pltffs' Post–Hearing Mem. for Summ. J., Ex. D at 1). ("The right to the industrial property title discussed in article L. 611–1 belongs to the inventor or his successor in title . . ."). Article L. 611–7, however, provides the following exceptions:

If the inventor is [*un salarié*], in the absence of any contractual stipulation more favorable to the *salarié*, the right of ownership of an intellectual property is determined according to the following:

1. Inventions made by a *salarié* during the performance of either an employment contract that incorporates an inventive function corresponding to his or her effective responsibilities, or of studies and research explicitly assigned to him or her, belong to the employer. The conditions whereby the *salarié*, as the author of a given invention, benefits from additional remuneration are determined by collective bargaining agreements, company agreements, and individual employment contracts.

   If the employer is not subject to any industry-wide collective bargaining agreement, all litigation concerning additional remuneration shall be submitted to the Conciliation Board instituted by article L.615–21 or to the Civil Court.

2. All other inventions belong to the *salarié*. However, whenever an in-

vention is made by a *salarié* "either in the course of performing his or her duties," or within the scope of company activities, or with knowledge or use of the company's technology, means, or data, the employer has the right, according to the terms and deadlines set by decree in the Conseil d'Etat, to claim ownership or enjoyment of all or part of the patent rights protecting the *salarié's* invention.

The *salarié* must receive a fair price for the invention, which, in the absence of an agreement between the parties, is determined by the Conciliation Board established by article L.615–21 or by the Civil Court. These tribunals will consider any information supplied to them by the employer and the *salarié* in determining the fair price, taking into account the initial contributions of both parties as well as the industrial and commercial utility of the invention.

3. The *salarié* who is the author of the invention shall inform his or her employer, who shall acknowledge receipt according to the terms and deadlines established by regulation. The *salarié* and the employer must provide each other with any relevant information regarding the invention in question. They must refrain from revealing any information that might compromise, in whole or in part, the exercise of the rights conferred by the present code. Any agreement between the *salarié* and his or her employer concerning an invention of the *salarié* must, at the risk of being declared null and void, be established in writing.

4. The rules for applying the present article shall be established by Decree in the Conseil d'Etat.

5. The provisions of the Article shall also be applicable to agents of the central government, of local authorities, or of any public law entity according to the rules established by decree in the Conseil d'Etat.

Art L. 611–7 (*translated in* Pltffs' Post–Hearing Mem. for Summ. J, Ex. A at 1).[2]

2. The original French text (accents omitted) of Article L. 611–7 is as follows:

Si l'inventeur est un salarie, le droit au titre de propriete industrielle, a defaut de stipulation contractuelle plus favorable au salarie, est defini selon les dispositions, ci-apres:

1. Les inventions faites par le salarie dans l'execution soit d'un contrat de travail comportant une mission inventive qui correspond a ses fonctionseffective, soit d'etudes et de recherches qui lui sont explicitement confiecs appartiennent a l'employeur. Les conditions dans lesquelles le salarie auteur d'une telle invention, beneficie d'une remuneration supplementaire sont determinees par les conventions collectives, les accords d'entreprise et les contrats individuels de travail.—V.C. *trav.*, *art.* L133–5 (12, f).—C. *trav.*

Si l'employeur n'est pas soumis a une convention collective de branche tout litige relatif a la remuneration supplementaire est soumis a la commission de conciliation instituee par l'article L.615–21 ou au tribunal de grande instance.

2. Toutes les autres inventions appartiennent au salarie. Toutefole lorsqu'une invention est faite par un salarie (L. n 94–102 *du 5 fevr.* 1994. *art.* 22) "soit dans le cours de l'execution de ses fonctions", soit dans le domaine des activites de l'entreprise, soit par la connaissance ou l'utilisation des techniques ou de moyens-specifiques a l'entreprise, ou de donnees procurees par elle, l'employeur a le droit, dans des conditions et delais fixe par decret en Conseil d'Etat, de se faire attribuer la propriete ou la jouitsance de tout ou partie des droits attaches au brevet protegeant l'invention de son salarie.

Le salarie doit en obtenir un juste prix qui, a defaut d'accord entre le parties, est fixe par la commission de conciliation instituee par l'article L. 615–21 ou par le tribu-

**804**

The regulations implementing Article L. 611–7 render the Article L. 611–7(5) statutory phrase "agents of the central government, of local authorities, or of any public law entity" in more compendious fashion: "civil servants and public agents." Art. R. 611.11.

The structure of Article L. 611–7 and its implementing regulations[3] seems reason-

nal de grande instance: ceux-ci prendront es consideration tous elements qui pourront leur etre fournis notamment par l'employeur et par le salarie, pour calculer le juste prix tant en fonction des apports initlaux de l'un et de l'autre que de l'utilite industrielle et comerciale de l'invention.

3. Le salarie auteur d'une invention en informe son employeur qui en accuse reception selon des modalites et des delais fixes par voie reglementaire.

Le salarie et l'employeur doivent se communiquer tous reneignements utiles sur l'invention en cause. Lls doivent s'abstenir de toute divulgation de nature a compromettre en tout ou en partie l'exercise des droits conleres par le present livre.

Tout accord entre le salarie et son employeur ayant pour objet une invention de salarie doit, a peine de nullite, etre constate par ecrit.

4. Les modalites d'application du present article sont fixees par decret a Conseil d'Etat.

5. Les dispositions du present article sont egalement applicables aux agents de l'etat, des collectivites publiques et de toutes autres personne morales de droit public, selon des modalites qui sont fixees par decret a Conseil d'Etat.

3. The regulations implementing the French Intellectual Property Code appear in *Protection des Inventions et des Connaissances Techniques, Brevets D'Invention*. The chiefly pertinent regulations implementing Article 611–7(5) are captioned *Les Inventions des Fonctionnaires et des Agents Publics [Inventions by Civil Servants and Public Agents]* and provide as follows:

**Art. R. 611.11** Provisions of Article L. 611–7 shall apply to civil servants and public agents serving either in central government agencies, or local authorities, or statutory agencies and any public law entity, subject to the conditions laid down in the present sub-section, unless more favorable contract terms govern the industrial property rights in their inventions. These provisions shall not preclude the maintenance or the introduction, in respect to such civil servants and public agents, of more favorable statutory measures.

**Art. R. 611.12** 1. Inventions made by a civil servant or a public agent during the performance of tasks including a mission of invention corresponding to his assignment or including studies and research explicitly entrusted to such civil servant or public agent, belong to the public entity on whose behalf he carries out such tasks or conducts such studies or research. (*Decree no 96–857*, Oct 2, 1996): "However, if the public entity decides not to proceed with the development of the invention, the civil servant or public agent who is the author may, by agreement with such public entity, benefit from the property rights attached to the invention, under terms and conditions stipulated in an agreement between the author and the entity".

2. All other inventions shall belong to the civil servant or public agent.

However, the employing public entity shall have the right, subject to the conditions and time limits set out in the present sub-section, to be awarded all or part of the rights deriving from the patent protecting the invention when such invention was made by a civil servant or a public agent:
— either in the exercise of his functions;
— or in the field of activity of said public entity;
— or by means of the knowledge or the use of techniques or means specific to that entity or of date provided by it.

**Art. R. 611.13** When a public agent works for more than one public entity, such entities shall act jointly in accordance with terms set by bey-laws or by agreement; such agreement shall be communicated to the public agents concerned as regard the rights and obligations laid down in the present sub-section.

**Art. R. 611–14** The civil servant or public agent who makes an invention shall immediately report it to the authority designated to that effect by the public entity employing him.

The provisions of Articles R. 611–1 to R. 611–10 on the respective duties of employees and employers shall be applicable to civil servants and to public agents and to the public entities concerned.

(*Translated in* Pltffs' Post–Hearing Mem. for Summ. J, Ex. B at 2). The original French text (accents omitted) of the foregoing is as follows:

ably straightforward. The first three paragraphs of Article L.611–7 describe the relative invention interests of a *salarié* and the employer of the *salarié*. The interests vary depending on the circumstances under which the invention came into being. Thus, "[i]nventions made by a *salarié* during the performance of either an employment contract that incorporates an inventive function corresponding to his or her effective responsibilities, or of studies and research explicitly assigned to him or her, belong to the employer." Art L. 611–7(1). "All other inventions belong to the *salarié*," Art L. 611–7(2), subject, however, to the entitlement of the employer to "claim ownership"—but with an appropriate measure of compensation to the inventor—of patents accruing from inventions "made by a *salarié* 'either in the course of performing his or her duties,' or within the scope of company activities, or with knowledge or use of the company's technology, means, or data." The fourth paragraph of Article L. 611–7 vests in the Conseil d'Etat the authority to promulgate "rules for applying the present article." And the fifth paragraph provides for the applicability of the "provisions of the Article" to "agents of the central government, of local authorities, or of any public law entity"—*i.e.*, the personnel described by implementing regulation Article R. 611.11 as "civil servants and public agents." By way of further implementation, paragraph 1 of Article R. 611.12 provides that "[i]nventions made by a civil servant or public agent during the performance of tasks including a mission

**Art. R. 611–11** Les fonctionnaires et les agents publics de l'Etat, des collectivites publiques, des establissements publics et de toute personne morale de droit public sont soumis aux dispositions de l'article L.611–7 dans les conditions fixees par la presente sous-section, a moins que des stipulations contractuelles plus favorables ne regissent les droits de propriete industrielle des inventions qu'ils realisent. Ces dispositions ne font pas obstacle au maintien ou a l'intervention, en ce qui concerne ces functionnaires et agents, de mesures reglementaires plus favorables.

**Art. R. 611–12** 1. Les inventions faites par le fonctionnaire ou l'agent public dans l'execution soit des taches comportant une mission inventive correspondant a ses attributions, soit d'etudes ou de recherches qui iui sont explicitement confiees appartiennent a la personne publique pour le compte de laquelle il effectue lesdites taches, etudes ou recherches. "Toutefois, si la personne publique decide de ne pas proceder a la valorisation de l'invention, le fonctionnaire ou agent public qui en est l'auteur peut disposer des droits patrimoniaux attaches a celle-ci, dans les conditions prevues par une convention conclue avec la personne publique."

2. Toutes les autres inventions appartiennent au fonctionnaire ou l'agent. Tou-tefois, la personne publique employeur a le droit, les conditions et delais fixes par la presente sous-section, de se faire attribuer tout ou partie des droits attaches au brevet protegeant l'invention lorsque celle-ci est faite par un fonctionnaire ou agent:

Soit dans le cours de l'execution de ses fonctions;
Soit dans le domaine des activites de l'organisme public concerne;
Soit par la connaissance ou l'utilisation de techniques, de moyens specifiques a cet organisme ou de donnees procurees par lui.

**Art. R. 611–13** Lorsqu'un meme agent exerce son activite pour le compte de plusieurs personnes publiques, celles-ci agissent de concert selon des modalites determinees par arrctc ou par accord porte a la connaissance des agents interesses pour l'exercice des droits et l'execution des obligations fixes par la presente sous-section.

**Art. R. 611–14** Le fonctionnaire ou agent public auteur d'une invention en fait immediatement la declaration a l'autorite habilitee par la personne publique don't il releve.

Les dispositions des articles R. 611–1 a R. 611–10 relatives aux obligations du salarie et de l'employeur sont applicables aux fonctionnaires et agents publics et aux personnes publiques interessees.

of invention corresponding to his assignment or including studies, and research explicitly entrusted to such civil servant or public agent, belong to the public entity on whose behalf he carries out such tasks or conducts such studies or research," Art. R. 611.12(1), while paragraph 2 provides that "[a]ll other inventions shall belong to the civil servant or public agent," subject to the entitlement of the "employing public entity" to acquire some or all of resultant patent rights "when such invention was made by a civil servant or a public agent ... in the exercise of his functions; or in the field of activity of said public entity; or by means of the knowledge or the use of techniques specific to that entity or of data provided by it."

The materials quoted in the preceding paragraph constitute the statutory and regulatory principles which, in the aggregate, govern the disposition of plaintiffs' motion for partial summary judgment. Plaintiffs contend that the record establishes as a matter of law that Dr. Simon was a "public agent" of CNRS. Since his "mission of invention ... includ[ed] ... research explicitly entrusted to" Dr. Simon, plaintiffs contend that Dr. Simon's contributions to the molecular combing inventions "belong to the public entity on whose behalf he carrie[d] out such tasks," Art R. 611.12, namely, CNRS (and, by extension, Institut Pasteur, CNRS's partner with respect to the molecular combing research). For these reasons, plaintiffs submit, their motion for partial summary judgment should be granted.

For purposes of the partial summary judgment motion, Dr. Simon does not dispute that his contributions to the molecular combing inventions were the fruit of his agreed research under the aegis of CNRS. Dr. Simon does, however, contest whether the record establishes, as a matter of law, that his status while working at CNRS was that of a public agent. Indeed, Dr. Simon contends that the record establishes the contrary. Accordingly, the issue now to be addressed is whether the record before this court establishes that Dr. Simon was a public agent or whether material facts remain in dispute.[4]

Despite considerable ambiguity in the case law surrounding Article L. 611–7(5), at least one principle emerges with some clarity from the interlocking statutory and

---

4. Dr. Simon also urges a subsidiary, but preliminary proposition. Dr. Simon contends that a demonstration that he was a public agent requires, as a predicate, antecedent demonstration that he was a *salarié*. Dr. Simon argues that Article L. 611–7, properly understood, posits *"salarié"* as the all-encompassing general category of which "agents of the central government, of local authorities, or of any public law entity," Article L. 611–7(5)—*i.e.*, "civil servants and public agents," Art. R. 611.11—constitute a sub-set. Dr. Simon's construction of the statute and its implementing regulations is unpersuasive. The structure and language of the statute and regulations show that the *salarié* provisions and the provisions relating to agents of government and of public law entities were intended to operate as independent, and complementary, categories—one [*salarié*] covering the private sector, the other [civil servants and public agents] the public sector. For example, the phrase *salarié* appears throughout Article L. 611–7(1–4), while Article L. 611–7(5) breaks from its predecessor provisions and makes no mention of *salarié* s or any of the descriptive attributes of *salarié* s (*e.g.*, contractual employment, remuneration, etc.). Moreover, the implementing regulations in Art. R. 611 are subdivided into those dealing with *salariés* versus those dealing with civil servants and public agents. While subsection 1 of Art. R. 611 (subsections 1–10) is entitled "Inventions by *salariés* " and describes regulations pertaining to inventions by *salariés*, subsection 2 of Art. R. 611 (subsections 11–14) is entitled "Inventions by Civil Servants and Public Agents" and describes regulations for inventions by civil servants and public agents.

regulatory provisions governing public agents. Just as a *"salarié"* is one who is in an *employment* relationship-i.e., one who serves an *"employer"* (Article L. 611–7(1); Article L. 611–7(2); and Article L. 611–7(3)—so, too, in implementation of the statutory directive that "[l]es dispositions du present article sont egalement applicable aux agents de l'Etat" (Article L. 611–7(5), and of the correlative regulation requiring that "[l]es dispositions des articles R. 611–1 a R. 611–10 relatives aux obligations du salarie et de l'employeur sont applicables aux fonctionnaires et agents publics et aux personnes publiques interessees" (Art. R.611–14), it is contemplated that a public agent (*"agent public"*) is one who is *employed* by a public entity. Thus, Art. R. 611–12(2) states the circumstances in which "la personne publique employeur" can acquire part or all of the rights arising from an "invention . . . faite par un fonctionnaire ou agent." *And see* Art. R. 611–14, reciting that "[l]e fonctionnaire ou agent public auteur d'une invention en fait immediatement la declaration a l'autorite habilitee par la personne publique don't il releve," translated as "[t]he civil servant or public agent who makes an invention shall immediately report it to the authority designated to that effect by the public entity employing him." (*Translated in* Pltffs' Post–Hearing Mem. For Summ. J, Ex. B at 2).[5]

In short, only one who can be fairly said to be *in the employ* of a public entity can, with respect to that public entity, be classified as a public agent.[6]

The record before the court does not compel the conclusion that Dr. Simon was an employee of CNRS (or, *a fortiori*, of Institut Pasteur). Dr. Simon's entire tenure was only two years. His work status was not the subject of a written agreement. Dr. Simon's compensation from French sources (as distinct from his NSF and NSF/NATO funding) came not from CNRS (or Institut Pasteur) but from the Ministry of Foreign Affairs. Dr. Simon was not a participant in the social welfare apparatus provided by CNRS to its staff. His status, as defined by the identity card issued to him by the Paris Police, was that of temporary student.

On the record before this court, Dr. Simon appears to have been, in effect, what in the United States is termed a post-doctoral fellow. An American scientist who had only recently gained the Ph. D., Dr. Simon was for two years engaged in collaborative endeavors with French scientists, two of whom (Dr. David Bensimon and Dr. Francois Heslot), were, respectively, the directors of the two French laboratories (Laboratoire de Physique Statistique and Laboratoire de Physique de la Matière Condensée) at which Dr. Simon

---

**5.** See also Art. R. 611–14–1:

Pour les fonctionaires ou agents publics de l'Etat et de ses etablissements publics regis par les dispositions applicables aux corps et **emplois** figurant sur la liste annexee au present chapitre et qui sont les auteurs d'une invention visee au 1 de'article R.611–12, la remuneration supplementaire prevue par l'artcle L. 611–7 est constituee par une prime d'interessement aux produits tires de l'invention par la personne publique qui en est beneficiare.

Pltffs' Post–Hearing Mem. for Summ. J, Ex. B at 2 (emphasis added).

**6.** Some confirmation of this conclusion is to be found in the three cases addressed to public agent status—*In re Berkani*, T.C. Lyon, Mar. 25, 1993, JCP 1996, II, 536; *In re Kerbouci*, T.C. Oct. 18, 1999, Gaz. Pal.2001, 2 pan jurispr.36; and *Thirard*, 1982 Recuiel 136—discussed by the parties. It would seem prudent, however, to eschew placing strong reliance on these cases because they are essentially rooted in administrative law rather than the law of intellectual property.

conducted the bulk of his research. As a member—and not a leader—of CNRS research teams, Dr. Simon appears to have had more of the indicia of what French courts regard as employee status than Christian Richard, chairman and a director of Rycovet France. *Richard v. Rycovet France*, Cass. Com., June 21, 1988 (Richard held not to be an employee). However, Dr. Simon did not have, at CNRS, the permanence and full academic scope enjoyed by Jean–Pierre Adolphe, a senior lecturer and laboratory head at the Pierre and Marie Curie University. *Adolphe et autres v. Universite Pierre et Marie Curie.* T.G.I. Paris, Dec. 3, 1993 (Adolphe held to be an employee). In short, the record does not permit a firm conclusion on whether Dr. Simon was—or was not—an employee within the intendment of Article 611-7 and its implementing regulations. Accordingly, no conclusion can be arrived at, as a matter of law, with respect to the over-arching question: whether Dr.

Simon was—or was not—a public agent. On the basis of the record before this court, Professor Bonet stated that "[to my knowledge, circumstances of [Dr. Simon's] kind have never arisen in French jurisprudence published to date.]" Bonet Report at 19.[7] With matters in this posture, the record does not provide an adequate basis for a determination, as a matter of French intellectual property law, that Dr. Simon was—or was not—a public agent. Accordingly, plaintiffs' motion for partial summary judgment will, in the order accompanying this memorandum, be denied.

---

7. The parties will not fail to note that the text quotation from Professor Bonet's report is the only express invocation in this opinion of the views of any of the three French law experts. The parties may find this odd, given that (a) the parties have devoted so much time and skill to the presentation of the reports and follow-up testimony of their two experts, and (b) the court, through the appointment of Professor Bonet, has introduced an added ingredient of expertise. Indeed, the court is grateful to the three experts for their dedicated efforts to educate the court about French intellectual property law.

Why, then, does the court's opinion not address the submissions of the experts? The answer is that the case law debated by the experts (and, in turn, by counsel in post-hearing memoranda enlarging upon the experts' submissions) has seemed to the court to be addressing, in almost every instance, fact patterns that were fairly remote from the case at bar. To have forced Dr. Simon's dispute with CNRS and Institut Pasteur into the framework of the cited cases would have been to tie it to a procrustean judicial bed. Further, the style of French judicial opinion-writing, as reflected in the cited cases, has not seemed to lend itself to generalized discussions of the law that embrace but have the capacity to transcend the particular controversy before the court—the sorts of generalized discussions that are characteristic of the common law method and that move English and American law forward from precedent to precedent. So the court has felt that the responsible course, in shaping its ruling on the motion for partial summary judgment, has been to put the chief weight of analysis on the actual language of the articles of the Intellectual Property Code and of the Code's implementing regulations, as distinct from the cases applying the Code. This is not to say that the cases discussed by the experts have been deemed without any pertinence (note, for example, the references to *Richard* and *Adolphe* in the above text paragraph), but simply that none of the cases, either singly or in the aggregate, seemed to shed more than glancing light on how a French court would assess the relationship between Dr. Simon and CNRS/Institut Pasteur.